**INTERNATIONAL UNION UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURE IMPLEMENT WORKERS OF AMERICA, UAW; Local No. 1051, International Union, United Aerospace and Agriculture Implement Workers of America, UAW, Plaintiffs-Appellants,**

v.

**LESTER ENGINEERING COMPANY and Nesco, Inc., Defendants-Appellees.**

**No. 82–3800.**

United States Court of Appeals, Sixth Circuit.

Argued Jan. 17, 1983.

Decided Oct. 12, 1983.

Carl J. Character, David Roloff, Stokes & Green, Cleveland, Ohio, John A. Fillion, Leonard R. Page, Ralph Jones (argued), Detroit, Mich., for plaintiffs-appellants.

John H. Wilharm, Jr. (argued), Baker & Hostetler, David G. Holcombe, Cleveland, Ohio, for defendants-appellees.

Before KEITH, KENNEDY and WELLFORD, Circuit Judges.

KEITH, Circuit Judge.

On September 29, 1982, Lester Engineering Company ("Lester"), defendant-appellee, announced the closing of its Church Avenue manufacturing facility. On October 1, the Union filed a grievance alleging that the plant closing was either a plant move in violation of Section 14.1 of the collective bargaining agreement or sub-contracting in violation of Section 5.5 of the collective bargaining agreement. A few days later, Lester denied the grievance. Subsequently, on November 10, 1982, plaintiff-appellant International Union, United Automobile, Aerospace and Agricultural Workers of America ("Union") filed the present action seeking a preliminary injunction to prevent Lester from selling its assets and ceasing business operations. The Union asserted that the preliminary injunction was needed to preserve the status quo until the grievance challenging the plant closing could be arbitrated. On December 6, 1982, United States District Court Judge Alvin I. Krenzler held that the plant closing decision was not arbitrable. The collective bargaining agreement did not preclude the plant closing, nor did it require Lester to bargain with the Union concerning the closing. We affirm.

I.

Lester Engineering Company ("Lester") is an Ohio corporation whose principal place of business is 2711 Church Avenue, Cleveland, Ohio. Lester manufactures aluminum die cast and plastic injection molding machines. The die cast machines are used by heavy industry to make transmissions, automotive parts, housing parts, and similar items. The plastic industry uses the molding machines to make various plastic parts.

Effective October 25, 1980, Lester became a party to a collective bargaining agreement with Local 1051 of the International Union, United Automobile, Aerospace and Agricultural Workers of America ("Union"). The agreement contains the terms and conditions of employment for all production and maintenance employees at Lester's Church Avenue facility. The agreement reads in pertinent part as follows:

Section 4.1 COMPANY RIGHTS: The Company shall exercise its functions of management under which it shall have the right to hire new employees and to direct the work force, to promote, demote, suspend, discipline, discharge for cause, transfer employees in accordance with the provisions of this Agreement, to layoff employees because of lack of work; to require employees to observe reasonable Company rules and regulations, not inconsistent with the provisions of this Agreement; *to decide the number and location of its plants;* products to be manufactured; and the methods and processes of manufacturing. It is agreed that these enumerations of management rights shall not be exclusive and shall not

be held to limit or restrict the Company from exercising other rights not herein enumerated, provided that these rights do not conflict with the expressed terms of this Agreement (emphasis added).

Section 5.5 SUB–CONTRACTING: When any department is scheduled for less than a forty (40) hour week, operations which are normally performed in that department will not be removed from the plant, provided the work is normally performed within the agreed standard hours. And provided, further, that if the work is to be performed on a machine other than that on which the operations are normally performed, and the work can be performed within the general range of time in which the work is normally performed.

Section 14.1 PLANT MOVE: If the plants, or any part of them, should be moved by the Company within a radius of seventy-five (75) miles of Public Square, this Agreement shall continue in full force and effect.

If such a move should be made beyond a seventy-five (75) mile radius, the Company will offer to the employees priority and employment at the new location, at such wage rates and benefits as may be established by the Company or by negotiations with the collective bargaining agency at that location.

The agreement also provides that grievances may be submitted to arbitration if a "satisfactory settlement" is not reached during the preceding three steps in the grievance process. Grievances are defined as a "dispute between the Company and any employee in the unit, concerning the interpretation, application, or claim of breach or violations of this Agreement."

Depressed economic conditions, particularly in the automotive and housing industries, had a severe impact on Nesco's northeast Ohio manufacturing subsidiaries. The financial status of Lester, the oldest and least efficient of Nesco's facilities, became acutely troubled. Yearly losses, a number of outstanding accounts payable, and severe cash flow problems plagued the company.

In the summer of 1982, Lester requested that the Union agree to certain concessions. In a letter dated June 23, the Union rejected the request. Eventually, the continuing impact of the recessionary economic conditions forced a reevaluation of Nesco's opportunities in northeast Ohio. Lester's operation was found to be duplicative of more modern facilities operated by Nesco subsidiaries such as Kent Machines Company and Barth Industries.

Accordingly, on September 29, Lester announced that it would close the Church Avenue facility, sell the plant and equipment, and cease business operations. The announcement in relevant part stated as follows:

As you are all well aware, the economy has had a considerable impact on Lester Engineering. The plant and machinery here are old and our ability to run an efficient and economic operation has been greatly hampered by that fact.

The continued economic slump also has had its impact on other companies owned by NESCO in northeast Ohio. Certain of those companies perform essentially the same kind of work as Lester. We have reviewed their operations as well as Lester's and have concluded that from a prudent business standpoint, certain companies will have to be closed. Duplication is a luxury few businesses can afford in today's economy.

We, too, have studied our situation carefully and have concluded that of the companies and plants currently in operation, Lester is the least modern and least economical operation. Therefore, we have reluctantly concluded that we must close Lester Engineering Co. Over the next few weeks, we will be completing the work in house and phasing Lester out of business.

The plant and equipment here at Lester will be sold. In the future, the Lester machine product line will be manufactured at Kent Machine Co. of Stow, Ohio.

Soon after the announcement, Lester began laying off union employees and transferring

bargaining unit work to Kent Machinery Company, a subsidiary of Nesco.

On October 1, the Union filed a grievance. The grievance alleged that Lester had announced that it intended to close the Church Avenue facility and lay off all bargaining unit employees by October 31. Lester's proposed action allegedly was a plant move in violation of Section 14.1 of the collective bargaining agreement or sub-contracting in violation of Section 5.5 of the collective bargaining agreementl On October 4, the grievance was denied. Lester stated: "Lester Engineering is closing and terminating all operations. The plant, the equipment, and all of the assets are being sold to pay creditors. Since all operations are being terminated, no plant move is occurring and there are no violations of Article 14 or any other provision" of the collective bargaining agreement. On October 11, the Union sent a mailgram to Lester urging Lester to agree to arbitrate the plant closing decision prior to November 1. Prior to the deadline, it appears that Lester agreed to the request.

On November 10, the Union filed the present action in the United States District Court for the Northern District of Ohio. The complaint recited the allegations contained in the grievance. The complaint further indicated that Lester had agreed to arbitrate the grievance, but was stalling arbitration until after machinery at the Church Avenue facility had been dispersed. Consequently, the complaint sought injunctive relief to restrain Lester from selling its assets, and transferring the bargaining unit work from the Church Avenue facility pending arbitration. The Union also complained that unless Lester was restrained its members would be wrongfully discharged and the arbitration process rendered meaningless. Moreover, it contends that union members would suffer a loss of wages, working conditions, seniority, hospitalization, pension, and other job conditions guaranteed by the collective bargaining agreement. These injuries allegedly could not be adequately compensated in money damages. On November 11, the district court entered a temporary restraining order to preserve the status quo.

On November 16, the district court held a hearing to consider the Union's request for a preliminary injunction compelling Lester to arbitrate the plant closing. Evidence was presented to the court which indicated that various machinery dealers had offered to purchase all of Lester's assets except the real estate, engineering files, and product line. Barth Industries, a subsidiary of Nesco Incorporated, had already purchased certain tooling and tools from Lester. Lester also stated that it intended to sell its product line and engineering files to Barth Industries. Kent Machinery Company of Stow, Ohio indicated that it planned to manufacture the Lester machine product line. There was no allegation here by the plaintiff that Lester was selling or transferring assets out of an anti-union animus, or to avoid dealing with a labor union. There was no showing that the closing was a "sham" or a devious act to circumvent Lester's obligations under its union contract.

On December 6, the district court held that Lester was selling its assets, liquidating its business, and ceasing to exist. No plant move or sub-contracting had taken place. More importantly, the court held the decision to close the plant was not arbitrable. Accordingly, the preliminary injunction motion was denied, and the complaint dismissed. On December 7, 1982, the Union filed a notice of appeal, and sought an injunction pending appeal. The district court denied the motion for an injunction pending appeal the same day it was filed. This court deferred action on the motion until the action could be heard on the merits.

## II.

### Injunction Pending Arbitration

The primary issue this Court must address is the propriety of the district court's refusal to issue an injunction halting the proposed closing of Lester's Church Avenue manufacturing facility. The landmark Supreme Court cases addressing the issue of granting injunctive relief to participants in

a labor dispute are *Boys Markets, Inc. v. Retail Clerk's Union, Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970) and *Buffalo Forge Company v. United Steelworkers of America, AFL–CIO,* 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976). These cases articulated the principles governing when an injunction may be issued to preserve the status quo pending arbitration. Today, we simply outline the *Boys Markets-Buffalo Forge* principles and apply them to the present case.

Boys Markets Injunction

In *Boys Markets, Inc. v. Retail Clerk's Union, Local 770,* the Supreme Court reconciled the broad anti-injunction provisions of Section 4 of the Norris-LaGuardia Act (Act) with strong congressional preference for arbitration. The Court reasoned that the inability of an employer to obtain judicial enforcement of a no-strike clause in a collective bargaining agreement could do more to undermine the arbitral process than a strictly enforced anti-injunction policy would do to promote it. The employee's promise not to strike is the *quid pro quo* for the employer's promise to arbitrate. Therefore, absent some mechanism for the enforcement of the no-strike obligation an employer has little incentive to commit itself to arbitration. To remedy the situation, the Court enunciated "a narrow exception" to the rigid prohibitions of Section 4. It held that a court may enjoin a strike which violates an express no-strike clause of a collective bargaining agreement where the parties have agreed to mandatory arbitration and traditional equitable bases for relief have been met. *Id.* 398 U.S. at 249–53, 90 S.Ct. at 1591–94; *Buffalo Forge,* 428 U.S. at 407, 96 S.Ct. at 3147; *Aluminum Workers International v. Consolidated Aluminum Corporation,* 696 F.2d 437, 441 (6th Cir.1982).

In *Buffalo Forge v. United Steelworkers,* the Supreme Court refined the *Boys Markets* exception. The Court reasoned that *Boys Markets* was designed solely to further the national policy favoring peaceful resolution of labor disputes through arbitration. *Id.* 428 U.S. at 408, 96 S.Ct. at 3148.

This policy is not in peril where neither the causes nor the issues underlying the dispute is subject to mutually binding arbitration. *Id.* at 407–08, 96 S.Ct. at 3147–48. Thus, the Court emphasized that a federal court may not enjoin unilateral action taken in response to a dispute simply because it violates the collective bargaining agreement. *Id.* at 410, 96 S.Ct. at 3149. Indeed, federal courts are similarly without jurisdiction where the legality of the unilateral action is subject to arbitration. *Id.* at 411, 96 S.Ct. at 3149. Injunctive relief is only available where the parties had agreed to arbitrate the dispute which precipitated the unilateral action in violation of the collective bargaining agreement. *Id.* at 407, 96 S.Ct. at 3147.

III.

Prerequisites to Issuance of Injunction Pending Arbitration

■ The Supreme Court has articulated a four-step procedure which a district court must follow to issue a *Boys Markets* injunction. First, the controversy must involve or grow out of a labor dispute within the meaning of Section 4 of the Act. Second, a full evidentiary hearing must be held. Third, the court must find that the dispute underlying the controversy is subject to binding arbitration under the terms of the collective bargaining agreement. Finally, the traditional equitable bases for injunctive relief must be met. A court has jurisdiction to issue an injunction only where all four of the above steps have been completed and satisfied.

Labor Dispute

■ The threshold determination is whether the controversy involves or emanates from a labor dispute within the meaning of Section 4 of the Norris-LaGuardia Act. 29 U.S.C. § 104. *See Jacksonville Bulk Terminals v. International Longshoremen's Association,* 457 U.S. 702, 102 S.Ct. 2673, 2679, 73 L.Ed.2d 327 (1982). Section 4 states in relevant part:

No court of the United States shall have jurisdiction to issue any restraining order

or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute . . . from doing, whether singly or in concert, any of the following acts:

> (a) Ceasing or refusing to perform any work or to remain in any relation of employment.

29 U.S.C. § 104. The term labor dispute is defined in Section 13 of the Act as "any controversy concerning terms or conditions of employment." 29 U.S.C. § 113(c). A labor dispute, however, may exist even where the complained of action was not motivated by economic self-interest. *Jacksonville Bulk Terminals,* 102 S.Ct. at 2681–84. The term labor dispute, nevertheless, does not include controversies upon which the employer-employee relationship has no bearing. *See Columbia River Packers Association v. Hinton,* 315 U.S. 143, 147, 62 S.Ct. 520, 522, 86 L.Ed. 750 (1942). The test is whether "the employer-employee relationship is the matrix of the controversy." *Jacksonville Bulk Terminals,* 102 S.Ct. at 2681. The test is satisfied where an employer and a union representing its employees are the disputants, and their dispute concerns the interpretation of the collective bargaining agreement that defines their relationship. *Id.*

### Evidentiary Hearing

■ The court must hold an evidentiary hearing. 29 U.S.C. § 107. *International Union, United Auto v. LaSalle Machine Tool, Inc.,* 696 F.2d 452 (6th Cir.1982); *Detroit Newspaper Publishers Association v. Detroit Typographical Union,* 471 F.2d 872, 876–77 (6th Cir.1972), *cert. denied,* 411 U.S. 967, 93 S.Ct. 2149, 36 L.Ed.2d 687 (1973). The parties should be allowed to present and cross-examine witnesses on all controverted facts and questions of law. *See Detroit & T.S.L.R. Co. v. Brotherhood of Locomotive Firemen & Enginemen,* 357 F.2d 152, 153–54 (6th Cir.1966). Section 7 of the Act makes the evidentiary hearing requirement jurisdictional:

No court of the United States shall have jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute, as herein defined, except after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto, if offered, and except after findings of fact by the court. . . .

29 U.S.C. § 107.

### Underlying Dispute Arbitrable

■ The court must also identify the underlying dispute, and determine whether it is subject to mutually binding arbitration. *See Boys Markets,* 398 U.S. at 254–55, 90 S.Ct. at 1594–95; *Buffalo Forge,* 428 U.S. at 407, 96 S.Ct. at 3147. The court's role is limited to determining whether the parties agreed to submit the underlying dispute to arbitration. *United Steelworkers v. American Manufacturing Co.,* 363 U.S. 564, 568, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960). The court has "no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim." *Id.*

The underlying dispute is the event or condition that triggered the responsive strike or employer action. *See Jacksonville Bulk Terminals,* 102 S.Ct. at 2680. *Accord Complete Auto Transit v. Reis,* 614 F.2d 1110, 1113 (6th Cir.), *cert. granted,* 449 U.S. 898, 101 S.Ct. 265, 66 L.Ed.2d 127 (1980), *aff'd,* 451 U.S. 401, 101 S.Ct. 1836, 68 L.Ed.2d 248 (1981). The arbitrability of the underlying dispute must be determined from the collective bargaining agreement entered into by the parties. *See Atkinson v. Sinclair Refining Co.,* 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962); *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). The scope of the arbitration clause generally should be read indulgently. *See United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960); *Lever*

*Brothers Co. v. International Chemical Workers Local 217,* 554 F.2d 115, 119 (4th Cir.1976). However, the management prerogative clause should also be carefully scrutinized to minimize the potential for encroachment upon areas of exclusive management responsibility. *See generally Local Lodge No. 1266 v. Panoramic Corporation,* 668 F.2d 276, 283–84 (7th Cir.1981).[1]

Traditional Criteria for Injunctive Relief

The injunction must also be warranted under traditional principles of equity. *See Boys Markets,* 398 U.S. at 254, 90 S.Ct. at 1594. The equitable principles articulated in *Boys Markets,* however, are substantially the same as the elements of a preliminary injunction which are outlined in Section 7 of the Act. *In United States v. Cunningham,* 599 F.2d 120 (6th Cir.1979), this Court stated that paragraphs (a) through (d) of Section 7 must be adhered to prior to issuing an injunction. *Id.* at 126 n. 12. *See also LaSalle Machine Tool,* 696 F.2d 452; *Consolidated Aluminum Corporation,* 696 F.2d at 445. Section 7 provides that courts do not have jurisdiction to grant an injunction in a labor dispute until the following findings have been made: (1) unlawful acts have been threatened or committed in violation of the collective bargaining agreement; (2) substantial and irreparable injury will occur[2]; (3) greater injury will occur by denying the injunctive relief sought than by granting it; and (4) there is no adequate legal remedy for the violation of the collective bargaining agreement. 29 U.S.C. § 107. *See LaSalle Machine Tool, Inc.,* 696 F.2d at 456. Section 9 of the Act requires that these four findings be "filed" prior to the issuance of the injunction. 29 U.S.C. § 109. This Court adopted a fifth requirement in *Consolidated Aluminum Corpora-*

tion. There, we stated that a plaintiff seeking to maintain the status quo pending arbitration pursuant to the principles of *Boys Markets* must also establish that the position he will espouse in arbitration is sufficiently sound to prevent the arbitration from being a futile endeavor. 696 F.2d at 442 n. 2.

The Present Case

■ In the present case, the underlying dispute is Lester's decision to close the Church Avenue manufacturing facility. That decision is the event which precipitated the grievance and the instant case. The decision to close is, as the District Court astutely observed, delegated to Lester under the terms of the collective bargaining agreement. The company rights clause of the agreement clearly gives Lester the unilateral right to close its facilities. Therefore, even if we read the arbitration clause broadly, we could not find the underlying dispute arbitrable.[3] In light of our conclusion on the arbitrability of the underlying dispute, we need not address the remaining criteria for obtaining a *Boys Markets* injunction.

Accordingly, the judgment entered by the district court is affirmed.

---

**1.** In *Complete Auto Transit,* this Court held that a strike which began over a nonarbitrable dispute could be transformed into a dispute over an arbitrable issue. 614 F.2d at 1113–14. The Supreme Court has not addressed the validity of the transformation analysis. *See Jacksonville Bulk Terminals,* 102 S.Ct. at 2686 n. 22.

**2.** *See Consolidated Aluminum Corporation,* 696 F.2d 437 for an excellent discussion of this issue.

**3.** Lester's decision to close the Church Avenue facility is also not subject to the duty to bargain. *Textile Workers Union of America v. Darlington Manufacturing Co.,* 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965); *First National Maintenance Corp. v. N.L.R.B.,* 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981). We, of course, do not hold that the manner in which the plant was closed cannot be subject to the duty to bargain.