**The DANNON COMPANY, INC., Plaintiff,**

v.

**William ("Willie") WHELAN, as President of Local 584, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Walter Huff, John Lestingi, John Maguire, Donald Jarman and Ibish Nela as Shop Stewards and Employees, John Doe 1, John Doe 2, etc. (John Does represent names of striking employees), Defendants.**

**No. 82 Civ. 121 (WCC).**

United States District Court, S.D. New York.

Jan. 26, 1983.

Solomon, Rosenbaum, Drechsler & Leff, New York City, for plaintiff; Robert M. Schanzer, David R. Rothfeld, New York City, of counsel.

Driscoll, Mulholland & Delaney, New York City, for defendants; John T. Driscoll, Michael J. Comerford, New York City, of counsel.

## OPINION

CONNER, District Judge:

This action involves a labor dispute between plaintiff The Dannon Company, Inc. ("Dannon") and the several defendants (collectively "Local 584"). The matter is currently before the Court on Dannon's alternative requests that Local 584 (a) be adjudged in contempt of a permanent injunction entered by this Court on January 15, 1982 with the consent of the parties, or (b) be preliminarily enjoined from engaging in any job action relating to the discipline of employees or the implementation of a route ticket procedure. Although I conclude that the scope of the permanent injunction previously entered in this matter does not embrace the acts currently complained of, I find, for the reasons stated below, that the entry of an order preliminarily enjoining the current work stoppage is appropriate.

*Background*

In January 1982, defendants commenced a strike against Dannon over a dispute concerning the transfer of certain operations from Dannon's Long Island City, New York facility to its plant in Ridgefield, New Jersey. Because the collective bargaining agreement between the parties contains a "no-strike" provision relating to disputes within the scope of the agreement's arbitration clause, and because that dispute allegedly fell within the clause, Dannon commenced this action on January 8, 1982 and

requested relief from any strike "over or in connection with the dispute or grievance relating to plaintiff's transfer of certain operations from Long Island City to Ridgefield, New Jersey." The matter was resolved on January 15, 1982 when the parties, after negotiation, consented to the entry of an order by this Court which provides that:

[D]efendant Local 584, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, its officers, agents, employees, members and persons acting by, through and for them, and each of them, be and hereby are permanently restrained from authorizing, engaging in, participating in, or sanctioning any strike or picketing of the plaintiff over any dispute or grievance arbitrable under the collective bargaining agreement between the plaintiff and Local 584.

The dispute concerning the transfer of operations was simply one example of the stormy relationship between the parties. Prior to that dispute, Local 584 had engaged in a series of work stoppages on unrelated issues, all allegedly in violation of its no-strike pledge. In February 1979, there was a strike of approximately three days duration; in January 1981 a work stoppage lasted almost four days; in March 1981 the men were out for a day; in January 1982 there was a two-day strike; and, finally, in the same month, there was the four-day job action that led Dannon to file this action. Since the entry of this Court's order on January 15, 1982, Local 584 staged a two-day walkout in October 1982.

On January 3, 1983, John Lestingi, a shop steward and Dannon employee, was fired for allegedly stealing products from the company. That same week, Jerry Losasso, another Dannon employee, and Donald Jarman, a Dannon employee, former shop steward and a member of the union's contract negotiating committee, were each suspended for three weeks, effective January 10, 1983, for reasons relating to the performance of their jobs. In response to the timing and nature of these disciplinary actions, and as a result of general discontent with certain new operating procedures implemented by Dannon, the members of Local 584 walked out in the predawn hours of January 7, 1983. As of today, they remain on strike.

The same day the strike commenced, Dannon discharged two employees for their roles in leading the walkout. One of these workers, Walter Huff, had been employed by Dannon for 32 years, had been a shop steward for twenty years, and was head of the Local 584 contract negotiating committee. The other discharged worker, Manny Torres, was also a shop steward. On January 10, two other workers, Lenny Huff, Walter Huff's son, and Harvey Mason, were fired for allegedly committing acts of vandalism in connection with the walkout.

On January 10, 1983, Dannon returned to this Court to force Local 584 to comply with the permanent injunction entered on January 15, 1982. The following day, a conference was held with the Court at which time the parties discussed the possibility of amicably and promptly resolving this latest dispute. Local 584 offered to get the men back to work, but on the condition that the *status quo* as of the time the workers walked out would be maintained. In other words, the workers would go back to work and the union would arbitrate the grievances of Lestingi, Losasso, and Jarman pursuant to the mechanisms set forth in the collective bargaining agreement, but no action would be taken against any of the men who had been fired or disciplined since the strike began. Also, as part of this proposal, Dannon would waive any right to damages resulting from the walkout. Dannon subsequently rejected this proposal, but the following day offered a countersuggestion in which it agreed to submit all of the grievances, including the post-strike firings, to expedited arbitration and to waive all rights to damages as a result of the strike, on the condition that the employees return immediately to work. Dannon's suggestion was rejected by defendants.

On January 14, Judge Charles Metzner of this Court held an evidentiary hearing on

the limited issue of whether the current walkout occurred in violation of the express terms of the permanent injunction. On the basis of the evidence adduced at that hearing, Judge Metzner concluded that Local 584 was responsible for the walkout, that all disputes existing at the time of the walkout were arbitrable under the collective bargaining agreement, and, therefore, that they should have been submitted to arbitration without strike action. Judge Metzner's findings were limited solely to the factual issue before him, and he expressly reserved judgment on the legal issue concerning the permissible scope of the January 15, 1982 permanent injunction.

On January 19, plaintiff filed, with leave of court, a supplemental complaint setting forth the facts underlying the instant walkout and requesting that defendants be restrained from engaging in any work stoppage "over or in connection with the dispute or grievance relating to the discipline of employees or utilization and implementation of the route ticket." On January 21, another hearing was had before the Court at which time the parties submitted evidence on Dannon's right to new injunctive relief based upon the allegations contained in the supplemental complaint. The parties also presented evidence on the question of their intent in consenting to the broadly worded permanent injunction entered by the Court on January 15, 1982. The record before the Court consists of the evidence adduced at these hearings and legal submissions by both sides. This Opinion and Order incorporates the Court's findings of fact and conclusions of law pursuant to Rules 52 and 65, F.R.Civ.P.

*Discussion*

A. *The Permanent Injunction*

■ The anti-injunction provision of the Norris-LaGuardia Act, 29 U.S.C. § 104, creates what was long considered an absolute bar to a federal court's power to enjoin a labor strike, even if that strike was in violation of a valid collective bargaining agreement. In *Boys Markets v. Retail Clerks Union, Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), the Supreme Court overruled its prior decision in *Sinclair Refining Co. v. Atkinson,* 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962), and created what it conceded to be a "narrow" exception to the literal terms of Norris-LaGuardia's bar. Where a collective bargaining agreement contains a no-strike clause and a provision for the binding arbitration of grievances, a federal court is permitted, but not required, to enjoin a strike over a grievance clearly within the scope of the arbitration provision. See *Boys Markets, supra,* 398 U.S. at 253–55, 90 S.Ct. at 1593–95. In recognizing this limited exception, the Court observed that the worker's no-strike obligation is the *quid pro quo* for the employer's agreement to submit grievance disputes to arbitration, and that "[a]ny incentive for employers to enter into such an arrangement is necessarily dissipated if the principal and most expeditious method by which the no-strike obligation can be enforced is eliminated." *Id.* at 248, 90 S.Ct. at 1591.

In *New York Telephone Co. v. Communications Workers of America, AFL–CIO,* 445 F.2d 39 (2d Cir.1971), the Second Circuit recognized the narrowness of the *Boys Markets* holding and ruled that § 9 of the Norris-LaGuardia Act, 29 U.S.C. § 109, which requires that any injunction issued in a labor dispute be restricted to the specific acts complained of, applies to injunctions issued by federal courts under the *Boys Markets* exception. See 445 F.2d at 49–50. The Court perceived no conflict between the policy favoring arbitration of labor disputes and the requirement that federal court injunctions be strictly construed and confined to their facts. See *id.* Thus, in *New York Telephone,* the Court held that a broadly worded temporary restraining order, which prohibited the union from "engaging in, or organizing, inducing, or encouraging others to engage in any strike, work stoppage, boycott of overtime work, slowdown or other form of interference with the business of plaintiff," entered during a strike over the transfer of workers and extended indefinitely with the consent of the parties, did not apply to a subsequent

strike on an unrelated grievance, even assuming that both disputes fell within the scope of the arbitration provision contained in the collective bargaining agreement. *Id.* at 51.

In *United Parcel Service, Inc. v. Local 804,* 698 F.2d 100 (2d Cir.1983), the Second Circuit had occasion to reflect upon its holding in *New York Telephone* as applied to a district court's power to issue a prospective labor injunction. The court ruled that even though a *Boys Markets* injunction must be responsive to the specificity requirements in § 9 of the Norris-LaGuardia Act, where a court makes specific findings that the union has engaged in a pattern of strike activity and that there is a likelihood of the same pattern recurring, it may issue a prospective injunction. *Id.,* at 110. The court reasoned that:

> In an egregious situation, an employer should not be forced to seek injunctive relief repeatedly when the union's conduct has shown flagrant disrespect for the arbitration process that is the quid pro quo for its no-strike promise. . . . To avoid the abuses inherent in strike injunctions, however, the entry of a prospective injunction must be accompanied by strict safeguards.
>
> . . . . .
>
> In conformity with the [Norris-LaGuardia] Act, a court must make specific findings at the outset with respect both to the genesis of prior work stoppages and to the likelihood of the same pattern recurring. Section 9 requires that, unless the same unlawful pattern is likely to continue, no prospective injunction should be entered.

*Id.,* slip op. at 111 (footnote omitted).

▄ The precise contours of the *United Parcel* holding are not altogether clear, and thus leave unsettled the power of a district court to enter a prospective injunction on facts beyond those at issue in that case. While it is clear that a court could, for example, prospectively enjoin a union from striking over route reassignments if it makes a specific finding that the union has done so in the past in violation of its no-

strike pledge and is likely to do so in the future, it is not certain that on the basis of *United Parcel* a court could enter a general prospective injunction barring a strike over any arbitrable grievance simply upon a finding that the union has in the past repeatedly engaged in illegal strikes over arbitrable grievances and is likely to do so in the future. This latter situation, while logically following from the Second Circuit's holding in *United Parcel,* would, in a *Boys Markets* situation, virtually eviscerate the restrictions on federal labor injunctions imposed by § 9 of the Norris-LaGuardia Act. To remain faithful to the policies set forth in *New York Telephone* for applying this section of Norris-LaGuardia in a *Boys Markets* context, any prospective injunction must be confined to the same types of violations of the no-strike pledge that have occurred in the past and are likely to occur in the future.

But even assuming that a court cannot issue a broad prospective order tracking the language of the contractual arbitration clause, there remains the further question whether the parties can consent to the entry of such an order, which would subject the union to summary contempt proceedings for *any* violation of its no-strike pledge. While there is some logical basis for allowing the parties complete freedom to contract for this unusual remedy, it would be a rare situation where one could imagine that they would indeed choose to do so. In the instant case I need not confront this difficult legal issue for, even assuming that the parties could consent and the court could thereupon enter an order permanently enjoining a union from striking over any arbitrable grievance, it is clear that, at a minimum, the parties must clearly indicate, for example by an express recitation in the order, that they intended this unusual and drastic remedy, or the court must make a finding that this is what the parties clearly intended. Under the instant facts, however, no such finding is warranted.

▄ The permanent injunction entered by this Court on January 15, 1982 does not

**366**

contain any recitation of the facts and circumstances leading up to its adoption by the parties. Moreover, the evidence adduced at the January 21, 1983 hearing before this Court does not demonstrate that Local 584 intended for all strikes in violation of the no-strike provision to be covered by the injunction it consented to. Although Aaron Solomon, Dannon's lawyer principally involved in the settlement of the labor dispute leading to the entry of the injunction, testified that the parties intended the broadly worded injunction to cover any arbitrable dispute, not just the route reassignment dispute at issue in that strike, his unsupported statement is insufficient to carry plaintiff's burden of proof on this issue. In contradiction of that testimony, William Whelan, President of Local 584 and a defendant in this action, testified that the negotiations leading to the settlement of the strike were concerned only with the specific issues leading to that walkout. He further stated that Local 584 would never intentionally subject itself to summary contempt proceedings for job actions on unrelated and perhaps unforeseen future issues.

The position of defendants on this point is even more persuasive when considered along with both the scope of Dannon's original complaint in this action and the terms of the settlement of that dispute. In its complaint, Dannon requested relief only for defendants' actions in connection with the dispute concerning the transfer of routes to New Jersey, and not for Local 584's habit of continually violating its no-strike pledge. Plaintiff did not in its complaint seek the injunction it now contends defendants consented to. On that basis, it is illogical to assume that the parties perceived their settlement in the broad terms urged by plaintiff. Rather, it is more sensible to believe that their discussions centered about resolving the particular dispute at hand and getting the employees back to work as quickly as possible.

Moreover, it is unclear what, if anything, Local 584 received in return for its hypothetical consent to this all-encompassing injunction. Dannon claims that it held off implementing certain work-related changes

in return for defendants' agreement to the broad injunction. More likely, however, Dannon's agreement to refrain for a period of time from making those changes provided the consideration simply for the employees' agreement to return to work. There is simply no *quid pro quo* for any agreement by Local 584 to consent to such a sweeping injunction. I conclude, therefore, that the permanent injunction entered by this Court on January 15, 1982 cannot legally be interpreted to extend to the instant dispute. Consequently, defendants are not currently in violation of any order of this Court.

### B. Preliminary Injunction

There remains the question whether, on the basis of Dannon's supplemental complaint, defendants should be preliminarily enjoined from continuing the current strike. In this Circuit, the standard for granting a preliminary injunction requires a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation coupled with a balance of hardships tipping decidedly in favor of the party seeking had preliminary relief. *Sperry International Trade, Inc. v. Government of Israel,* 670 F.2d 8, 11 (2d Cir.1982). In addition, a party requesting a labor injunction must, because of the operation of § 8 of the Norris-LaGuardia Act, 29 U.S.C. § 108, satisfy the Court that it has made reasonable efforts to resolve the dispute before seeking judicial intervention. I conclude that Dannon has clearly met the requirements for preliminary injunctive relief in this case.

 That Dannon is suffering irreparable harm because of this strike is not seriously doubted by anyone. The walkout has seriously curtailed, if not virtually halted, the delivery of Dannon's products in the New York metropolitan area. While the actual loss of sales each day during the pendency of the walkout can adequately be redressed by monetary damages, the residual, and possibly permanent effect of Dan-

non's failure consistently to supply its customers cannot. Stephen Gorkin, Dannon's Chief Administrative Officer, testified that the company has received calls from several customers each complaining that because Dannon has repeatedly been shown to be unable to supply its products in a reliable manner, it will no longer carry Dannon but will switch instead to another brand. It is this permanent effect on Dannon's market, which may continue long after the labor dispute is concluded, that constitutes irreparable harm.

█ It is equally clear that Dannon has shown a likelihood of success on the merits. The collective bargaining agreement between the parties provides for arbitration as follows:

> Any and all disputes and controversies arising under or in connection with the terms or provisions of this agreement or in connection with or relating to the application or interpretation of any terms or provisions hereof, or in respect of anything not herein expressly provided, but germane to the subject matter of this agreement, which the representatives of the Union and the Employer have been unable to adjust, shall be submitted to arbitration as hereinafter provided, and the decision of the arbitrator shall be binding and conclusive on both parties.

The agreement also contains the *quid pro quo* for that provision in the form of Local 584's promise not to strike over any arbitrable grievance.

> No strikes, stoppages, lockouts or walkouts shall be ordered, sanctioned, or enforced by either party hereto against the other during the life of this agreement, except as against the party failing to comply with any decision or any order of the arbitrator appointed as provided herein.

The current walkout arose over a dispute involving the disciplining of three workers, John Lestingi, Jerry Losasso, and Donald Jarman, and the implementation of a new procedure involving route tickets. Dannon's actions against each of the workers was taken pursuant to Article XVI of the collective bargaining agreement, and thus they clearly fall within the scope of the grievance and arbitration provision. Similarly, the implementation of the route ticket procedure also "arises under or in connection with" the collective bargaining agreement, and is also subject to arbitration. By the same token, these disputes are within the scope of Local 584's no-strike pledge. It is, therefore, likely that this walkout is in violation of the collective bargaining agreement and that Dannon will ultimately succeed on the merits of its claim.

Since the beginning of the walkout Dannon has taken disciplinary action against four other workers. These disputes also appear to be subject to arbitration under the collective bargaining agreement, and are thus within Local 584's no-strike undertaking. Although defendants argue that Dannon has no right to fire any worker for leading a strike, that argument is addressed to the merits of the particular discharge, and as such it is not properly before the Court. The parties have agreed to arbitrate their grievances. Whether Walter Huff and Manny Torres were properly discharged is a matter that will be determined by an arbitrator. If the arbitrator agrees with the union's position that these workers were improperly fired, he has power under the collective bargaining agreement fully to redress the wrong. The important factor for this Court, however, is that in return for the employer's promise to submit such a dispute to arbitration, Local 584 has agreed not to strike in protest. Since it appears likely that the walkout is based solely upon such disputes, it follows that Dannon has demonstrated likelihood of success on the merits, the second requirement for obtaining preliminary injunctive relief.

I also find that Dannon has made a good-faith effort to resolve this dispute and has thus met its burden under § 8 of the Norris-LaGuardia Act. The testimony of both sides was that during the first week of January 1983, representatives of Dannon and Local 584 met on several occasions in an attempt to avert a walkout over what many employees considered to be a series of

politically motivated suspensions and firings coupled with the implementation of a new and undesirable work procedure. The parties were not able to settle the matter and the employees walked out on Friday, January 7. Since that time the parties have made further attempts to resolve their dispute peacefully. Local 584 made a proposal of settlement on Tuesday, January 11, which was rejected by Dannon. Dannon, however, made a counter-offer, which was subsequently rejected by the union.

Defendants argue that because Judge Metzner stated in his findings of fact that Dannon should have accepted Local 584's January 11 proposal as a means of swiftly resolving this matter, it should now be precluded under § 8 from obtaining the injunctive relief it seeks. This argument, however, misconstrues the nature of Judge Metzner's comments. Judge Metzner was only making a factual determination that defendants were responsible for the walkout, and his comments on Dannon's refusal of the January 11 offer were only offered as a recommendation to this Court on an appropriate level of damages for Local 584's violation of the January 15, 1982 permanent injunction. They in no way constitute findings on the reasonableness of Dannon's efforts under § 8 of Norris-LaGuardia to settle the dispute.

Moreover, a final attempt to settle this matter was made at the hearing before the Court on Friday, January 21. At that time Dannon accepted a Court proposal to waive all claims for damages on account of the walkout and to reinstate all disciplined workers with the exception of John Lestingi, subject to the condition that all of the disputes would be subjected to expedited arbitration. Local 584 rejected this proposal, and stated that it could accept no proposal for settlement in which Walter Huff remained subject to any disciplinary action. Mr. Whelan, President of Local 584, stated that the men would not stand for any action being taken against Mr. Huff. Based upon the testimony of the witnesses and the negotiations I have personally witnessed, I find that Dannon has made a reasonable effort to settle these disputes without judi-

cial relief, and thus has satisfied § 8 of the Norris-LaGuardia Act.

For the reasons stated above, I find that injunctive relief is appropriate in this instance, and is permissible under the Norris-LaGuardia Act pursuant to the guidelines set forth by the Supreme Court in *Boys Markets, Inc. v. Retail Clerks Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). A separate Order will be entered today in connection with this Opinion setting forth the terms of this injunction.

## ORDER

In accordance with the Opinion entered today in this matter, it is hereby

ORDERED, that preliminarily until final termination of this action, defendant Local 584, its officers, agents, servants, representatives, members and employees, and all those in active concert or participation with them who receive actual notice of the order, be enjoined and restrained from:

a. In any manner calling, instigating, directing, encouraging, causing, assisting or participating in any strike, work stoppage, slowdown or interruption in the operation of plaintiff's Long Island City or Ridgefield, New Jersey facility, by and among any of plaintiff's employees, over or in connection with the dispute or grievance relating to the discipline of employees or utilization and implementation of route ticket procedures or in response to an arbitrator's decision on those matters.

b. Picketing in any manner in and about the vicinity of plaintiff's Long Island City or Ridgefield, New Jersey facility for the purpose or for the effect of calling, instigating, directing, encouraging, causing, assisting or participating in any strike, work stoppage, slowdown or interruption in the operation of plaintiff's Long Island City or Ridgefield, New Jersey facility by and among any of plaintiff's employees employed at the Long Island City or Ridgefield, New Jersey facility, over or in connection with the dispute or grievance relating to the discipline of employees or utilization and implementation of route ticket proce-

dures or in response to an arbitrator's decision on those matters.

It is FURTHER ORDERED, that defendant Local 584, its officers, agents, and representatives immediately direct all employees represented by defendant Local 584 and employed by plaintiff at its Long Island City and Ridgefield, New Jersey facilities to return to work immediately.

It is FURTHER ORDERED, that plaintiff and defendant Local 584 submit any dispute between them relating to the discipline of employees or utilization and implementation of route ticket procedures to expedited arbitration in accordance with the applicable provisions of the collective bargaining agreement.